UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| MARTIN MARTINEZ,<br><br>        Petitioner,<br><br>    v.<br><br>M. E. SPEARMAN,<br><br>        Respondent. | Case No. 18-CV-00911-LHK<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY** |

Petitioner, a state prisoner proceeding *pro se*, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenged his 2015 criminal judgment. Respondent filed an answer, and petitioner filed a traverse. Having reviewed the briefs and the underlying record, the Court concludes that petitioner is not entitled to relief, DENIES the petition and DENIES a certificate of appealability.

## I.     BACKGROUND

The following facts are taken from the California Court of Appeal's opinion in *People v. Martinez*, No. A145497, 2016 WL 4382627 (Cal. Ct. App. Aug. 17, 2016):

> Defendant and 17-year-old Angelo Zuniga had a fight at a party that ended when defendant pulled a knife from his pocket and repeatedly stabbed Zuniga to death. Defendant claimed self-defense.

1

The October 25, 2008 party was hosted by high school senior Doris Vargas in the garage of her family's San Francisco home. Vargas testified that about 30 to 50 young people attended, including Vargas's classmate and defendant's sister, Mariela Martinez. Mariela arrived at the party around 8:00 p.m. and defendant arrived later. Mariela was "frightened" when defendant arrived, according to Vargas. Vargas testified that defendant was angry with Mariela, who "was supposed to be home." A "little bit" later, Vargas saw Mariela dancing with Andy Mondragon. Mondragon later told the police that defendant walked up to him, "got into [his] face," said "what's up?" and made movements toward him like he was going to take a swing. Vargas "immediately stood between them and told them there shouldn't be any violence." Mondragon later went up to defendant to apologize for dancing with Mariela but defendant told him "don't speak no more. I'll cut your throat." Mondragon left the party.

The confrontation between defendant and Zuniga occurred sometime later. Defendant's sister Mariela was dancing with other girls when Zuniga tried to "freak dance" with her. A friend of defendant and Mariela, Alexander Torres, testified that Zuniga "touch[ed] her hand to see if she wanted to dance with him" and tried to come up behind her to rub himself against her. Torres saw from Mariela's body language that she did not want to dance with Zuniga but did not think she needed his help to resist Zuniga's advances.

The prosecution witnesses provided few details about the ensuing fight between defendant and Zuniga. Abigail Ferreira saw defendant punch Zuniga but did not know if other punches were exchanged. Jesus Rodriguez said that he heard someone scream "fight," looked around, and saw "wild punches" being thrown between defendant and Zuniga. Rodriquez started walking toward the fight and was halfway across the garage when he saw Zuniga drop to the floor. Defendant immediately left the garage.

The first 911 call reporting a stabbing was made at 11:50 p.m. The police and paramedics arrived within minutes but were unable to revive Zuniga. He died of multiple stab wounds. A medical examiner testified there were seven knife wounds, including a stabbing wound to the chest; a cluster of four to the left lower back; and a slashing cut to the arm. Two of the wounds caused lethal injury, a chest wound that punctured the aorta and a back wound that punctured the spleen. The medical examiner found no wounds, bruises or scratches on Zuniga's hands. Zuniga was intoxicated at the time of his death, with a blood alcohol ratio of .12 to .13 percent.

After stabbing Zuniga, defendant went to a friend's house to meet his brother. One of the people present at the house testified that defendant had no cuts or bruises on him but did have redness and swelling around one eye. Defendant and a female friend went to the kitchen where the friend burned defendant's knife over the stove and washed it in the sink. Defendant was arrested after leaving the house, at 1:12 a.m., slightly more than one hour after the stabbing.

When interviewed by the police, defendant denied stabbing Zuniga and even denied being at the party. At booking, a nurse evaluated defendant's medical condition. The nurse saw no injuries. Defendant was asked if he "had any injuries or any type of recent trauma" and he said "no." Defendant's shirt was later found to have Zuniga's blood on the shoulder and sleeve, and defendant's own blood on the collar.

While incarcerated, defendant wrote letters to Oliver Barcenas, a member of the Norteño street gang with the moniker "Vicious." The letters, which defendant admits writing, were seized from Barcenas's residence during a search. The letters have handwriting on one side and "ghost writing" on the back—indented writing made by a pen without ink that scores the paper and appears invisible to the naked eye until shaded with a pencil.

Defendant's March 2013 letter, in "ghost written" script, asked Barcenas to persuade Alexander Torres, one of the party-goers, to testify that Zuniga had a knife and to "smack" Andy Mondragon, who defendant threatened before stabbing Zuniga. Defendant wrote: "Oli: I got news from my lawyer. There's a problem with Catracho [Torres] 0/30th Street. He's supposed to testify on my behalf, but he's starting to go astray. I need him to get on the stand and say that dude pulled out a knife on me and when the lights came on the knife disappeared, dude's knife disappeared. I need him to beat this case. Holla at him for me ASAP. He needs to cooperate with my lawyer before trial. I need Andy smacked and Catracho 0/30th holla at my legal team. I can't go home or beat this case if this ain't taken care of. Bruh, can hook you up with Catracho. I know he's got problems with the 30th Street niggas. Tell him we can fix his problems with them. Let him know I need his help. His AKA over the phone is 'Vero.' Bruh, I need all this ready and established ASAP before June. It's ugly. My D.A. ain't trying to work with me. Smack Andy and get at Catracho ASAP. Lil Bruh can help you get in contact with Catracho. I'm running out of time. The code for when you receive this is 'I got the Twilight book you wanted.'"

Another ghost script letter in March 2013 asked Barcenas to "smack" Mondragon and gave Mondragon's home address: "Oli, Bruh, make that happen ASAP. His address is 1374 Hampshire. I'm sure he still lives there. Have Bruh double check if dude live there. I watch the news every day. When you smack him, tell me 'you took the pics of that breeze.' When you get this letter say 'I got them new shoes that you wanted.' So that's the code when you receive this letter. You need to smack him before my trial. I'm not coming home if he get on the stand. Smack him ASAP, 1374 Hamp. Bring me home. I go to court Friday for a trial date. From now to my trial date he need to get smacked. Holla at me ASAP. Remember the address and destroy the letter."

A police officer expert in gangs testified that, in Norteño slang, "to smack" a witness means to kill a witness. The testimony was as follows: "Q.... There are specific words used in this letter on the back.

Case No. 18-CV-00911-LHK (PR)
ORDER DEN. PET. FOR WRIT OF HABEAS CORPUS; DEN. CERTIFICATE OF APPEALABILITY

It says 'I need Andy smacked.' Do you have an opinion with respect to a Norteño like Mr. Barcenas, what that means? [¶] A. I believe it means to have Andy killed. [¶] Q. Why do you believe that? [¶] A. I looked at the contents of the letter and the way the word 'smack' was used, and that's my belief what it meant. [¶] ... [¶] Q. What was the basis of your opinion from your discussions with other Gang Task Force members? [¶] A. That it just reaffirmed my opinion that it meant to kill. [¶] I also spoke to a dropout Norteño gang member, and I posed the question to him. I asked him if as a Norteño gang member he were told to smack a witness in a case what would he interpret that to mean. And he said it would be to kill the witness. [¶] Q. What about the context of the letter itself. Was there anything about that that aids in your opinion that in this context the word means to kill? ... [¶] A. The line that jumped out at me was 'I watch the news every day. When you smack him tell me' you took pictures of that breeze.' ... [Y]ou're not going to see somebody who was smacked on the news if he was given a backhand or a slap. It's not going to make the 6 o'clock news [on] the TV. The only thing it's going to be is somebody that's killed or greatly assaulted. [¶] Q. Now, when you say you talked to another Norteño about the term, in any of your investigation of the nature or meaning of the term, were you provided information that it meant something other than to kill? [¶] A. No." On cross-examination, the officer conceded that "there are many definitions of 'smack' that don't mean kill in the ordinary common usage of the word," including to "beat up." However, on redirect, the officer reasserted his opinion that the term "smack," when read in the context of the letter, means to kill.

Mondragon, whom defendant sought to have "smacked," testified that he was "reluctant" to be a witness at trial. In his testimony, he described his encounter with defendant as a "small confrontation" and said he could not remember anything about what happened or what was said. The prosecution relied upon Mondragon's earlier police statement describing the confrontation and relating defendant's threat to cut his throat.

Torres was also a subject of the letters. Defendant told Barcenas that Torres was "supposed to testify on my behalf" to say that Zuniga "pulled a knife" but Torres is "starting to go astray." Torres testified for the prosecution at trial, saying that he did not see the fight but, to help defendant, had falsely told a defense investigator that Zuniga was armed with a knife during the fight. Torres called the investigator to recant the story and, at trial, reaffirmed that he never saw Zuniga with a knife.

Defendant testified in his own defense. He said he was drinking with friends on the night of the party when his mother called and asked him to check on his sister who was not answering her cell phone. Defendant went to the party and told his sister that their mother was trying to call her. Defendant said he was not angry with Mariela and told her she could stay at the party. Defendant also stayed at the party, socializing and drinking. He testified that the party-goers were freak-

dancing, which is common at parties. Defendant said he had a "small confrontation" with Mondragon. Defendant could not remember why they argued. Friends stepped in between them and the confrontation was over—"it was just a few minutes, and that was that." Mondragon approached defendant later and "said something. ... I don't remember what he said, but I cut him off and told him to get out of my face." Defendant denied threatening Mondragon.

Sometime later, Mariela made "eye contact" with defendant as if "something was wrong." Defendant walked over to her and she told him "I don't want to dance with this guy," referring to Zuniga, who was standing nearby. Defendant testified, "I got in his face" and told Zuniga "that's my sister, she doesn't want to dance with you." Zuniga, according to defendant, replied "I don't give a fuck" and punched him in the face. Defendant testified that Zuniga continued punching him. Defendant backed up, put up his hands to defend himself, and lowered his face to avoid the blows. Defendant testified: "When I put my head down I saw him come up with something. [¶] ... [¶] He had something in his hand. I'm not positive what it was, but I assumed it was a knife." Defendant "freaked out." "I went into my pocket, and I pulled out a knife." Zuniga "kept hitting me. And I stabbed him, and he just wouldn't stop. It was real quick and pushed him off." Defendant said he stabbed Zuniga in the side on the first thrust and did not know where the other thrusts landed: "It happened really fast." Defendant testified that Zuniga was facing him "the whole time."

Defendant testified that he ran from the garage because he thought Zuniga "was going to chase [him]." Defendant's nose was bleeding. He got a ride with a friend. Defendant went to see his brother and told him what happened. His brother took the knife and defendant did not see it again.

Defendant admitted repeatedly lying to the police. Defendant said he lied because he was "scared" and his brother said "keep your mouth shut." Defendant admitted writing letters to Barcenas about Torres and Mondragon, and knowing that Barcenas is a Norteño gang member. Defendant testified that he wrote the letters because he wanted Torres to remain involved in the case. In asking Barcenas to "smack" Mondragon, he meant "[t]o rough him up, to hit him" in order "[t]o keep him from testifying." Defendant denied the truth of Mondragon's police statement but wanted to stop his testimony "[b]ecause he said some bad stuff that made me look bad."

*Martinez*, 2016 WL 4382627, at *1-4.

## II.    LEGAL STANDARD

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The

5

petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the U.S. Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, the application must also be unreasonable." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the U.S. Supreme Court as of the time of the state court decision. *Id.* at 412. Clearly established federal law is defined as "the governing legal principle or principles set forth by the [United States] Supreme Court." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).

### III.     DISCUSSION

Petitioner raised four claims in his federal habeas petition. Specifically, petitioner argued: (1) the trial court improperly allowed the gang expert to testify about the meaning of "smack"; (2) the trial court improperly instructed the jury on mutual combat even though there was

6

insufficient evidence to support that instruction; (3) the trial court improperly instructed the jury not to consider manslaughter until the jury had unanimously determined that petitioner was not guilty of first or second degree murder; and (4) the trial court's response to the jury's question during deliberation failed to clarify the jury's confusion and resulted in an unfair trial.

The Court will first address petitioner's claim regarding the mutual combat jury instruction; next will address petitioner's claims regarding the manslaughter jury instruction and the trial court's response to a jury question regarding this instruction; and finally will address petitioner's claims regarding the testimony by the gang expert.

### A. Jury Instruction Regarding Mutual Combat

Petitioner challenged the decision to give the jury an instruction regarding mutual combat. Pet. at 26-30.

The facts relevant to this claim are as follows: Petitioner and the victim got into a fight at a party, and witnesses saw "wild punches" being thrown. *See Martinez*, 2016 WL 4382627, at *1-2. Petitioner stabbed the victim, resulting in the victim's death. *See id*. at *1. The victim had seven stab wounds, including one to the chest, a cut across the arm, and four wounds in the lower back. *See id*. at *2. A witness testified that, following the incident, petitioner did not have any cuts or bruises "but did have redness and swelling around one eye." *Id*. at *2. At booking, during evaluation by a nurse, petitioner said that he had no injuries or any recent traumas. *Id*. at *2.

At trial, petitioner claimed he stabbed the victim in self-defense. *See id*. at *1. The jury was instructed that there are limitations on the right to self-defense when it is invoked by one who started a fight or engaged in mutual combat. *See id*. at *5. The jury instruction was as follows:

> A person who engages in mutual combat or who starts a fight has a right to self-defense only if he actually and in good faith tried to stop the fight.
>
> He indicated by word or conduct to his opponent in a way that a reasonable person would understand that he wanted to stop fighting and he had stopped fighting.
>
> And 3, he gave his opponent a chance to stop fighting.

> If the defendant meets these requirements, he then had a right to self-defense if the opponent continued to fight.
>
> A fight is mutual combat when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose.
>
> A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force.

Dkt. No. 6, Ex. B (Reporter's Transcript, hereinafter "Transcript") at 1732:15-1733:4 (oral instructions quoting CALCRIM 3471); *see also* Dkt. No. 6-3, Ex. A ("Clerk's Transcript") at 1020 (written jury instruction quoting CALCRIM 3471) (together, "CALCRIM 3471 Instruction"). The jury rejected petitioner's claim of self-defense and convicted him of second degree murder with personal use of a knife, in violation of California Penal Code Sections 187, 189, and 12022(b)(1). *Martinez*, 2016 WL 4382627, at *1.

Petitioner argued that the trial court erred by giving the jury the CALCRIM 3471 Instruction, because the instruction was not supported by the evidence. Pet. at 26-30. The California Court of Appeal considered and rejected this argument:

> The evidence fully supported the instruction. Defendant testified that he "got in [Zuniga's] face" for trying to dance with Mariela. Ferreira saw defendant punch Zuniga and Rodriguez saw "wild punches" being thrown between them. Earlier, defendant had confronted and threatened another boy for dancing with Mariela. The only evidence that Zuniga was the initial and lone aggressor was provided by defendant's self-serving testimony, which was in conflict with physical evidence showing only slight injury to defendant and multiple stab wounds to Zuniga, several in the back. The evidence, as a whole, permits the inference that defendant was the initial aggressor or voluntarily engaged in a physical fight. The jury was properly instructed on the matter and given the opportunity to weigh whether defendant started the fight or consented to fight with Zuniga before the claimed occasion for self-defense arose.

*Martinez*, 2016 WL 4382627 at *6.

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) ("[I]t must be established not merely that the instruction is undesirable,

8

erroneous or even 'universally condemned,' but that it violated some [constitutional right]." (citation and internal quotation marks omitted)). The instruction may not be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial record. *See Estelle*, 502 U.S. at 72. A habeas petitioner is not entitled to relief unless the instructional error "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). In other words, state prisoners seeking federal habeas relief may obtain plenary review of constitutional claims of trial error but are not entitled to habeas relief unless the error resulted in "actual prejudice." *Id.* (citation omitted).

Here, petitioner argued that the CALCRIM 3471 Instruction was not supported by the evidence. Pet. at 26-30. A state court's factual finding regarding whether there was sufficient evidence to warrant an instruction under state law is entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1), which can only be overcome by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Disagreement with the state court's interpretation of the facts made by reiterating the same contentions made previously does not satisfy this burden. *See* 28 U.S.C. § 2254(e)(1); *Sophanthavong v. Palmateer*, 378 F.3d 859, 866-67 (9th Cir. 2004). Before the California Court of Appeal, petitioner conceded that he "'got in [Zuniga's] face' for trying to dance with Mariela." *Martinez*, 2016 WL 4382627 at *6; *see also* Pet. at 26-27 (conceding that petitioner "approach[ed] Zuniga and confront[ed] him about his inappropriate contact with" Mariela). However, petitioner argued that this "was not such unpredictable and aggressive behavior as to infer an agreement to fight," and "does not, alone, support an inference that one as opposed to the other was the initial aggressor." *Id.* at 27. The state appellate court expressly rejected those arguments in finding sufficient evidence to support the CALCRIM 3471 Instruction. Petitioner did not introduce clear and convincing evidence to rebut the presumption that the state court's conclusion was correct, and so has not carried his burden.

Nor can it be said that the CALCRIM 3471 Instruction resulted in actual prejudice. First, the CALCRIM 3471 Instruction did not preclude the jury from finding that petitioner acted in self-

defense. Rather, the CALCRIM 3471 Instruction stated only that under specified circumstances, petitioner could not legitimately claim self-defense. If, as petitioner argued, the evidence did not fit those specified circumstances, then the jury could have disregarded the CALCRIM 3471 Instruction. *See* Clerk's Tr. at 430 (quoting CALCRIM 200 and instructing the jury that some instructions may not apply, depending on the jury's findings of fact).

Second, although petitioner argued that the CALCRIM 3471 Instruction erroneously conflates mutual combat with being the initial aggressor in a fight, *see* Pet. at 28 (arguing that jurors could "mist[ake]" the fight "for 'mutual combat,' regardless of whether or not [petitioner] threw the first punch"), there was significant evidence that "permit[ted] the inference that defendant was the initial aggressor," *Martinez*, 2016 WL 4382627 at *6. Witnesses testified that they never saw the victim acting aggressively or violently, and a witness saw petitioner punch the victim but did not see the victim throw any punches. *See* Dkt. No. 6-1 ("Memorandum") at 13 (summarizing testimony). Petitioner stated that he had no injuries following the fight, further supporting the inference that he was the aggressor. *Martinez*, 2016 WL 4382627 at *2. Finally, petitioner's counsel conceded that "[t]here was evidence there was a mutual combat." Tr at 1549:9.

Accordingly, petitioner's claim that the trial court erred by instructing the jury on mutual combat fails and petitioner is not entitled to federal habeas relief on this claim.

### B. Jury Instruction and Juror Question Regarding Manslaughter

Petitioner challenged an instruction given to the jury regarding the lesser included offense of manslaughter, and the trial court's response to a jury question regarding this lesser included offense. Pet. at 31-37. The Court analyzes these two claims together because petitioner's arguments are intertwined. *See id*. at 31 (discussing the jury's question in the section of the Petition that challenged the jury instruction).

The facts relevant to this claim are as follows: Petitioner and the victim got into a fight at a party, and witnesses saw "wild punches" being thrown between petitioner and the victim. *See Martinez*, 2016 WL 4382627, at *1-2. Petitioner stabbed the victim, resulting in the victim's

United States District Court
Northern District of California

death. *See id.* at *1. Among other crimes, petitioner was charged with first degree murder. Tr. at 1479:5 (referring to a first degree murder charge).

The trial court instructed the jury:

> You will be given verdict forms for guilty and not guilty of first degree murder, second degree murder and voluntary manslaughter. You may consider these different kinds of homicide in whatever order you wish, but I can accept a verdict of guilty or not guilty of second degree murder only if all of you have found [petitioner] not guilty of first degree murder, and I can accept a verdict of guilty or not guilty of voluntary manslaughter only if all of you have found [defendant] not guilty of both first and second degree murder."

Tr. at 1728:27-1729:7 (oral instructions quoting CALCRIM 640). The admonition that the jury could consider homicide "in whatever order [it] wish[ed]" also appeared in the written jury instruction. *See* Clerk's Tr. at 471, 1014 (written jury quoting CALCRIM 640) (together with the oral jury instruction, "CALCRIM 640 Instruction"); *Martinez*, 2016 WL 4382627, at *6 (noting the jury verdict form accurately quoted CALCRIM 640).

The jury asked for clarification of the verdict form:

> 1.  If we find the defendant guilty of 1st or 2nd degree murder, it is our understanding that we need to evaluate whether the decision should be reduced to voluntary manslaughter; can you please confirm?

> 2.  If we find the defendant not guilty of 1st or 2nd degree murder, should we then evaluate whether the act is voluntary manslaughter? We are confused because the instructions say:

> "A killing that would otherwise be murder is reduced to voluntary manslaughter if ..."

> However, the jury verdict forms say:

> "Do not take final vote on the verdict unless you have found the defendant not guilty of 187 Penal Code 1st and 2nd degree murder."

Clerk's Tr. at 487 (jury questions regarding verdict form); *see also* Clerk's Tr. at 491 (jury verdict form for second degree murder, informing the jury not to "take final vote . . . unless you have found the defendant not guilty of . . . 1st degree" murder). The trial court referred the jury back to

the CALCRIM 640 Instruction by way of answer. *Martinez*, 2016 WL 4382627, at *6. The jury convicted petitioner of second degree murder with personal use of a knife, in violation of California Penal Code Sections 187, 189, and 12022(b)(1). *Martinez*, 2016 WL 4382627, at *1.

Petitioner argues that the trial court improperly instructed the jury not to consider manslaughter until the jury had unanimously determined that petitioner was not guilty of first or second degree murder, and that the trial court's response to the jury's question during deliberation failed to clarify the jury's confusion regarding this instruction. Pet. at 31-37. Petitioner argues that these actions resulted in an unfair trial. *See id*.

As to these claims, the California Court of Appeals held:

> The instruction and verdict form were proper. A "jury may deliberate on the greater and lesser included offenses in whatever order it chooses, but that it must acquit the defendant of the greater offense before returning a verdict on the lesser offense. [Citation.] In this manner, when the jury renders its verdict on the lesser included offense, it will also have expressly determined that the accused is not guilty of the greater offense. [¶] The acquittal-first rule, requiring the jury to expressly acquit the defendant before rendering a verdict on the lesser offense, serves the interests of both defendants and prosecutors" and an instruction incorporating this principle should be given "at the outset of jury deliberations," as it was here. (*People v. Fields* (1996) 13 Cal.4th 289, 309, italics omitted.)
>
> Defendant argues that the verdict form misstated the law. Defendant equates the verdict form's directive that the jurors must find defendant not guilty of murder before taking the "final vote" on a verdict of manslaughter as a directive that the jurors could not deliberate on manslaughter unless and until they acquitted defendant of murder. Defendant's construction is untenable. The verdict form simply admonished the jury not to take a *final* vote on voluntary manslaughter without first acquitting defendant of murder. The admonishment did not tell the jury it could not *consider* the lesser included offense and any potential confusion was eliminated by the instruction informing the jurors "You may consider these different kinds of homicide in whatever order you wish." (CALCRIM No. 640.)
>
> . . .
>
> "The court has a primary duty to help the jury understand the legal principles it is asked to apply. [Citation.] This does not mean the court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for

12

information. [Citation.] Indeed, comments diverging from the standard are often risky." (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.)

The court properly responded to the jury's question by reiterating instructions specific to their concerns about the interplay of murder and manslaughter principles. Read together, those instructions told the jury to "consider these different kinds of homicide in whatever order you wish" (CALCRIM No. 640); "a killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion" (CALCRIM No. 570); and to complete particular verdict forms if the jurors "agree that the defendant is not guilty of first degree murder and not guilty of second degree murder, but also agree that the defendant is guilty of voluntary manslaughter" (CALCRIM No. 640). The jury was fully advised to consider both murder and manslaughter before rendering their final verdict.

*Martinez*, 2016 WL 4382627, at *6-7.

Regarding the jury instruction, petitioner must show that the instruction was so ambiguous that "'there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." *Estelle*, 502 U.S. at 72. A "meager 'possibility'" that the jury misapplied the instruction is not enough. *Kansas v. Carr*, 136 S. Ct. 633, 643 (2016) (citation omitted). Here, petitioner has not shown even a "meager possibility" that the jury misapplied the CALCRIM 640 Instruction.

The jury was expressly told three separate times to "consider these different kinds of homicide in whatever order you wish." First, the jury was given this instruction orally by the trial judge. *See* Tr. at 1729:1-2 (oral instructions quoting CALCRIM 640). Second, the jury was given the instruction in writing, and was referred back to this written instruction by the trial judge. *See* Clerk's Tr. at 471 (written jury instructions quoting CALCRIM 640) *and* Tr. at 1705:19-20 ("THE COURT: I will give you a copy of the instructions to use in the jury room."); *see also id.* at 1907:22-23 (in response to the jury question, stating that the jury would be referred to the written copy of CALCRIM 640). Third, this admonition was included in the verdict form. *See Martinez*, 2016 WL 4382627, at *6 ("The verdict forms contained similar admonitions."). The record also suggests the jury understood the CALCRIM 640 Instruction: on the verdict form for second degree murder, which had a substantially identical instruction, the jury circled the words "final

1    vote," suggesting it recognized the importance of these words. *See* Clerk's Tr. at 491. Given that

2    the jury was given the correct directive on three separate occasions, the state court's conclusion

3    that any ambiguity had been cured was reasonable. *See Martinez*, 2016 WL 4382627, at *6 ("any

4    potential confusion was eliminated by the instruction").

5            Petitioner relied on the fact that the jury questioned the CALCRIM 640 Instruction, and

6    was referred back to that instruction, to support his argument that the CALCRIM 640 Instruction

7    was ambiguous. *See* Pet. at 31-32 (arguing the jury's question demonstrates the instruction's

8    ambiguity). This is also the basis for petitioner's argument that the trial court erred in not

9    clarifying jury instructions. *See* Pet. at 35-37, 36 ("the issue moves to whether or not the court's

10   response was adequate" . . . "This portion of CALCRIM No. 640 would not have aided jurors").

11   However, it is well-settled that when a trial judge responds to a jury question by directing it to an

12   instruction that answers its inquiry, and the jury asks no follow-up questions, a reviewing court

13   may "presume[] that the jury fully understood the judge's answer and appropriately applied the

14   jury instruction." *Waddington v. Sarausad*, 555 U.S. 179, 196 (2009). Just as a jury is presumed to

15   follow its instructions, "a jury is presumed to understand a judge's answer to its question." *Weeks*

16   *v. Angelone*, 528 U.S. 225, 234 (2000). Because the jury asked no follow-up questions here after

17   being referred to CALCRIM 640, the Court presumes the jury understood and applied that

18   instruction.

19           Alternatively, even assuming that the CALCRIM 640 Instruction was ambiguous, and the

20   ambiguity was not cured, petitioner has not demonstrated that such error resulted in a substantial

21   and injurious effect on the jury's verdict. *See Brecht*, 507 U.S. at 637. The evidence clearly

22   supported a finding by the jury that petitioner committed second degree murder. Under California

23   law, "second degree murder based on implied malice has been committed when a person does 'an

24   act, the natural consequences of which are dangerous to life, which act was deliberately performed

25   by a person who knows that his conduct endangers the life of another and who acts with conscious

26   disregard for life.'" *People v. Watson*, 30 Cal. 3d 290, 300 (1981) (citations and internal quotation

27   marks omitted); *see also* Tr. at 1723:10-16 (instructing the jury on express and implied malice).

28

14

That petitioner stabbed the victim seven times, inflicting two lethal wounds, *see Martinez*, 2016 WL 4382627, at *2, supports a finding that he acted knowing that his conduct endangered the victim's life, and acted with conscious disregard for that life.

Because the CALCRIM 640 Instruction was not ambiguous, there is no showing the jury did not understand the CALCRIM 640 Instruction, and in any event there is no showing of prejudice, petitioner is not entitled to federal habeas relief on this claim.

### C.    Testimony by the Gang Expert

At petitioner's trial, the prosecution introduced testimony from a gang expert. Petitioner challenged this testimony in his Petition. Pet. at 16-25.

In brief, the facts relevant to this claim are that petitioner wrote letters to Barcenas in "ghost written" script while in jail. *See Martinez*, 2016 WL 4382627, at *2. These letters included requests that Barcenas "smack" a witness expected to testify against petitioner. *Id*. These letters were written in March 2013, and petitioner asked Barcenas to "smack" the witness "ASAP before June" and "before [petitioner's] trial." *Id*. at *2-3. Petitioner wrote that he would know if the witness had been "smack[ed]" because petitioner "watch[ed] the news every day." *Id*. at *3.

The prosecution argued that petitioner meant "to kill" when he instructed Barcenas to "smack" the witness and introduced a gang expert's opinion supporting this contention. *Id*. at *3. The jury agreed and convicted petitioner of solicitation to commit murder in violation of California Penal Code Section 653f(b). *Id*. at *1. To be convicted under this Section, the guilty person must, "with the intent that the crime be committed, solicit[] another to commit or join in the commission of murder . . . ." Cal. Penal Code § 653f(b). Here "the crime" that petitioner intended "be committed" was to "[k]nowingly and maliciously attempt[] to prevent or dissuade any witness or victim from attending or giving testimony at any trial, proceeding, or inquiry authorized by law." Cal. Penal Code § 136.1(a)(2); *see also Martinez*, 2016 WL 4382627, at *1 (noting petitioner was found guilty of violating Penal Code Sections 653f(b) and 136.1(a)(2)).

Petitioner raised three arguments challenging testimony by the gang expert as fundamentally unfair: (1) that the testimony invited the jury to make the inadmissible inference

United States District Court
Northern District of California

that petitioner was a member of the Norteño gang, Pet. at 23; (2) that the testimony showed the trial court assumed petitioner was a member of the Norteño gang, which "amounted to the trial court acting in the role of adversary," *id*. at 22; and (3) that the gang expert's testimony relieved the prosecution of the burden of "prov[ing] that petitioner knew what he wrote would be interpreted as a request to kill," which effectively "lowered the burden of proof with respect to petitioner's intent," Traverse at 5-6.

Upon review of the record, it appears that petitioner's first two arguments regarding the gang expert – that the gang expert's testimony introduced prejudicial character evidence, and that admission of this testimony shows the trial court acted with bias – were not raised to the California Supreme Court and so were not exhausted. *See* Dkt. No. 6, Ex. J (petition for review to the California Supreme Court, challenging the gang expert's testimony only on the grounds that it invaded the province of the jury); *see also O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) (explaining that, to exhaust, a petitioner must invoke "one complete round of the State's established appellate review process."). However, respondent appears to have waived the exhaustion issue. *See* Ans. at 2 ("Petitioner has exhausted the claims raised in the instant petition."); *see also* 28 U.S.C. § 2254(b)(3) ("A State shall not be deemed to have waived the exhaustion requirement . . . unless the State, through counsel, expressly waives the requirement."). Accordingly, because it appears respondent waived the exhaustion requirement as to petitioner's character evidence and judicial bias arguments, and because the Court concludes these arguments fail in any event, the Court will proceed to consider these arguments. *See Cassett v. Stewart*, 406 F.3d 614, 624 (9th Cir. 2005) (holding a court may deny an unexhausted petition that fails to raise a federal claim); *see also Jones v. Davis*, No. 806 F.3d 538, 544-45 (9th Cir. 2015) (same).

The Court will address each of petitioner's three arguments in turn.

### 1. Impermissible Inferences Regarding Petitioner's Character

Petitioner challenged the admission of testimony by a gang expert regarding the meaning of "smacked" in petitioner's letters to Barcenas. *See* Pet. at 21-25. Petitioner argued the trial court erred by failing to consider "what was implied by the gang evidence, and its potential for

prejudice." *Id*. at 21. He argued "[t]he assumption . . . that this is one gang member writing another" "was not lost on the jury." *Id*. at 24. He also argued that, to conclude petitioner intended "to smack" as "to kill," the jury "would have to assume that petitioner was [a] Norteño." *Id*.

Petitioner did not explain in the Petition why it would be impermissible for the jury to assume or to conclude that petitioner is a Norteño, or how such a conclusion would have rendered petitioner's trial fundamentally unfair. *See generally, id*. at 21-25. However, the record reveals that before petitioner's criminal trial, the trial court granted petitioner's motion in limine and excluded gang evidence because it concluded evidence of petitioner's gang affiliation was of limited relevance; evidence of petitioner's gang affiliation was unduly prejudicial in violation of California Evidence Code Section 352; and evidence of petitioner's gang affiliation would only be offered to show criminal disposition in violation of California Evidence Code Section 1101. *See* Dkt. No. 6, Ex. B at 357-372. Accordingly, the Court assumes that petitioner intended to argue that evidence from which the jury could conclude petitioner is a gang member was improper because such a conclusion would be prejudicial and suggest petitioner's criminal disposition.

In the Memorandum supporting its Answer ("Memorandum"), respondent argued that the gang expert's testimony regarding the meaning of "smacked" was relevant. *See* Dkt. No. 6-1 ("Memorandum") at 6-7. Respondent explained that "the prosecutor had to prove that petitioner intended to induce Oliver Barcenas to murder Andy Mondragon," and so had to elicit testimony as to what Barcenas, "a Norteño gang member[,] would understand was the meaning of the word 'smack.'" *Id*. Therefore, the gang expert's testimony was "relevant to prove a charge in dispute" and "was not fundamentally unfair." *Id*. at 7.

As to petitioner's argument that admission of the gang expert's testimony was generally prejudicial, the admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process. *See Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999). The U.S. Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant

issuance of the writ." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding that trial court's admission of irrelevant pornographic materials was "fundamentally unfair" under Ninth Circuit precedent but not contrary to, or an unreasonable application of, clearly established Supreme Court precedent under § 2254(d)); *see, e,g., Zapien v. Martel*, 849 F.3d 787, 794 (9th Cir. 2016) (because there is no U.S. Supreme Court case establishing the fundamental unfairness of admitting multiple hearsay testimony, *Holley* bars any such claim on federal habeas review). Thus, the state court's decision cannot be contrary to, or an unreasonable application of, clearly-established federal law. *Carey v. Musladin*, 549 U.S. 70, 77 (2006).

As to petitioner's argument that the gang expert's testimony amounted to impermissible character evidence, the U.S. Supreme Court has expressly left open the question of whether admission of propensity evidence violates due process. *See Estelle*, 502 U.S. at 75 n.5. Based on the U.S. Supreme Court's reservation of this issue as an "open question," the Ninth Circuit has held that a petitioner's due process right concerning the admission of propensity evidence is not clearly established as required by AEDPA. *See Alberni v. McDaniel*, 458 F.3d 860, 866-67 (9th Cir. 2006); *accord Mejia v. Garcia*, 534 F.3d 1036, 1046 (9th Cir. 2008) (reaffirming *Alberni* and stating that there is "no Supreme Court precedent establishing that admission of propensity evidence, as here, to lend credibility to a sex victim's allegations, and thus indisputably relevant to the crimes charged, is unconstitutional."). As federal courts may grant habeas relief only if a state court decision is contrary to, or an unreasonable application of clearly established federal law as determined by the U.S. Supreme Court, *see* 28 U.S.C. § 2254(d)(1), there can be no federal habeas relief on this claim because there is no clearly established federal law. Therefore, a state court's rejection of such a claim cannot be grounds for federal habeas relief. *Larson v. Palmateer*, 515 F.3d 1057, 1066 (9th Cir. 2008).

Alternatively, even assuming there was a clearly established law that a petitioner had a due process right regarding the admission of prejudicial or propensity evidence, the due process inquiry in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. *See Walters v. Maass*, 45 F.3d 1355,

Case No. 18-CV-00911-LHK (PR)
ORDER DEN. PET. FOR WRIT OF HABEAS CORPUS; DEN. CERTIFICATE OF APPEALABILITY

1357 (9th Cir. 1995). Here, petitioner argued that gang expert testimony identifying Barcenas as a Norteño and opining as to the meaning of Norteño slang impermissibly suggested that petitioner was also a Norteño. *See generally*, Pet. at 21-25. However, petitioner also testified that he knew Barcenas was a Norteño. *See* Tr. at 1293:19-22 ("Q. Did you know Oliver was a Norteno [sic]? A. Yes. Q. Did you know his monicker [sic] or his name was Vicious? A. Yes. Q. And you knew he was in jail with you for a violent crime? A. Yes. Q. And a gang-related crime? A. Yeah, I think, yes."). Petitioner therefore testified to the same fact that he claimed impermissibly suggested petitioner was a Norteño. Because petitioner's testimony duplicated that of the gang expert, the gang expert's testimony cannot be said to be fundamentally unfair.

Moreover, in light of all the evidence presented at trial the Court cannot conclude that the admission of evidence that petitioner knew a Norteño was "so prejudicial that it rendered the trial fundamentally unfair." *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995). The jury heard significant evidence that cast petitioner in a negative light, and the Petition did not challenge this evidence. For example, the jury heard that petitioner began another confrontation earlier in the evening of October 25, 2008, and that when the would-be opponent attempted to apologize to petitioner, petitioner threatened to "cut [his] throat." *Martinez*, 2016 WL 4382627, at *1; *see also* Tr. at 1233:11-1235:14 (testimony from petitioner confirming the altercation but denying the threat).

As to the fight with the victim, as discussed above, the jury heard sufficient evidence from which to conclude that petitioner began the fight that ended in the victim's death, *see* III.A, and to conclude that petitioner did not act in self-defense, *see* III.B. Moreover, petitioner admitted that he fled the scene after stabbing the victim, Tr. at 1241:25-1242:16; that he lied to police about multiple issues when police detained him after the stabbing, *id*. at 1253:2-7, 1294:8-1296:18; and that he asked Barcenas to tamper with two witnesses by encouraging one witness to speak on petitioner's behalf, and by discouraging another witness through physical violence from speaking against petitioner, *see id*. at 1259:7-1260:5 (admitting he asked Barcenas to "get[] Catracho" and

to "rough [Andy] up, to hit him"). In light of this evidence, the fact that petitioner knew Barcenas was a Norteño is not so prejudicial that it would have rendered the trial unfair.

Finally, only if the jury can draw <u>no</u> permissible inferences from evidence can its admission violate due process. *See Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991). Here, the jury could draw the permissible inference that petitioner intended Barcenas to read "smack" as an instruction to kill the witness, without necessarily inferring that petitioner was a Norteño. Although the gang expert testified that "smack" meant "to kill" in Norteño slang, petitioner's counsel elicited testimony that non-gang members are also familiar with gang slang:

> Q: There's a lot of offensive language to people who are not in that culture. . . . That's not uncommon among young Latin males in this environment; is that a fair statement? Your experience?
> A: In what environment?
> Q: In being a young Latin male growing up in the Excelsior, and I'm talking about the kind of language these young people use?
> A: Yes, you do hear it, and there's other people that don't use it. It seems to --
> Q: It's not limited to people who are members of gangs?
> A: That's correct.
> Q: And as offensive as it may be, it's not particularly uncommon, is it?
> A: No.

Tr. at 1184:5-22. The jury could draw the inference that petitioner was familiar with Norteño slang regardless of whether petitioner was a Norteño. In other words, petitioner, without being a Norteño, could know how a Norteño such as Barcenas would read the word "smack."

Accordingly, petitioner's claim that the jury drew impermissible conclusions from the gang expert's testimony fails and petitioner is not entitled to federal habeas relief on this claim.

### 2. Argument Regarding Judicial Bias

Petitioner's second argument regarding the gang expert's testimony is that the trial court assumed petitioner was a member of the Norteño gang, which "amounted to the trial court acting in the role of adversary." Pet. at 22. Liberally construed, this appears to be an argument that petitioner was deprived of his constitutional right to a fair and impartial judge. *See In re Murchison*, 349 U.S. 133, 136 (1955) ("A fair trial in a fair tribunal is a basic requirement of due process."); *Kennedy v. Los Angeles Police Dep't*, 901 F.2d 702, 709 (9th Cir. 1989) ("the judge

must always remain fair and impartial . . . 'and avoid even the appearance of advocacy or partiality'") (citation omitted).

The standard for granting habeas claims on these grounds is high. A claim of judicial misconduct by a state judge in the context of federal habeas review does not simply require that the federal court determine whether the state judge committed judicial misconduct. Rather, the question is whether the state judge's behavior "rendered the trial so fundamentally unfair as to violate federal due process under the United States Constitution." *Duckett v. Godinez*, 67 F.3d 734, 740 (9th Cir. 1995) (citations omitted), *cert. denied*, 517 U.S. 1158 (1996). A trial judge "deprives the parties of a fair trial only when 'the record discloses actual bias ... or leaves the reviewing court with an abiding impression that the judge's remarks and questioning of witnesses projected to the jury an appearance of advocacy or partiality.'" *United States v. Parker*, 241 F.3d 1114, 1119 (9th Cir. 2001) (citation omitted).

Here, the trial judge's conduct with respect to the gang expert testimony does not disclose any bias. Instead, the record shows that the trial judge was careful to exclude evidence of petitioner's gang affiliation that could be considered prejudicial or inflammatory. *See* Tr. at 361:4-8 ("THE COURT: I'm not going to let any evidence come in that Mr. Martinez was a member of a gang. I don't think we have any evidence before us. It's not charged. I think it's extremely prejudicial unless somehow this is a gang killing or a gang event. It's irrelevant on a 352 issue. I'm not going to allow that information in."); 361:24-26 (excluding prejudicial gang information); 364:8-11 (same); 366:21-25 (same).

Moreover, petitioner's counsel, Mr. Bourdon, appeared to agree with the trial judge that some gang evidence was appropriate to provide context to petitioner's letters. *See id.* at 359:22-27 ("MR. BOURDON: [Discussing gang evidence from the grand jury proceedings] The gang evidence was only to contextualize the meaning. THE COURT: I think that's the instruction I'm going to give the jury. MR. BOURDON: I agree with you. To contextualize the meaning and significance of the letters."). Mr. Bourdon also appeared to agree with the trial judge that it was appropriate to admit evidence that Barcenas was a Norteño. *See id.* at 360:2-4 (MR. BOURDON:

21

The question is what is the gang evidence that you're allowing. We can stipulate that Oliver Barcenas was a member of the Norteno [sic] street gang.").

Considering the trial judge's efforts to prevent gang information from prejudicing petitioner, and Mr. Bourdon's agreement that the information admitted by the trial judge was appropriate, the Court cannot conclude that the record shows any "actual bias" against petitioner.

Nor does the record show the trial judge "projected to the jury an appearance of advocacy or partiality" with respect to the gang expert's testimony. As agreed with Mr. Bourdon, the trial judge orally instructed the jury that the gang expert's testimony was "only for [the jury] to put the letters . . . in context." *Id*. at 1150:23-26. The trial judge sustained Mr. Bourdon's only objections to the gang expert's testimony, on hearsay grounds, *id*. at 1164:8-13, 1170:2-10, and excluded evidence at Mr. Bourdon's request, *id*. at 1173:1-1175:6. Because the trial judge was careful to instruct the jury as to the limited relevance of the gang expert's testimony and ruled in petitioner's favor on all objections to that testimony, the trial judge's behavior with respect to the gang expert would not have projected "an appearance of advocacy or partiality" to the jury.

Because the trial judge neither displayed actual bias, nor projected advocacy or partiality to the jury, petitioner's claim that he was deprived of his constitutional right to a fair and impartial judge fails. Petitioner is not entitled to federal habeas relief on this claim.

### 3.    Argument Regarding Burden of Proof

Petitioner's third argument is that the gang expert testified regarding the ultimate issue of petitioner's intent and thereby relieved the prosecution of the burden of proving intent. As noted above, petitioner admitted that he asked Barcenas to tamper with witness testimony in violation of California Penal Code Section 136.1(a)(2). *See* III.C.1 (discussing Tr. at 1259:7-1260:5). For petitioner to be convicted of the additional charge of solicitation of murder, the jury had to find that petitioner intended Barcenas to murder the witness to prevent the witness's testimony. *See* Cal. Penal Code § 653f(b) (defining solicitation of murder). Petitioner's intent in making the request to Barcenas was therefore an element of the solicitation charge.

United States District Court
Northern District of California

As a preliminary matter, petitioner did not raise this argument in the Petition. *See* Pet. at 16-25. Instead, the Petition merely stated that the California Court of Appeal rejected the idea that the gang expert invaded the province of the jury regarding the ultimate issue of intent, *see id.* at 16, and stated "it is a well-established rule that expert testimony concerning an ultimate issue is permissible," *id.* at 20. It is not until the Traverse that petitioner gave reasoned argument that the gang expert testified as to an ultimate issue in his case. Traverse at 5-6.

Arguments made for the first time in a traverse have not been properly raised. *See Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994) (concluding that arguments made for the first time in a traverse were not properly raised to the district court, and therefore not cognizable on appeal); *accord Lopez v. Dexter*, 375 F. App'x 724 (9th Cir. 2010) ("[T]he claim improperly surfaced for the first time in his traverse to the state's answer . . . The district court appropriately rejected it on that basis, and we decline to consider it on appeal.") (citation omitted). The Court therefore rejects petitioner's third argument, that the prosecution was relieved of its burden of proof as to the element of intent, as not properly raised.

In any event, this argument would fail on the merits because the record shows that the burden of proof on the element of intent was not lessened or shifted. First, the record shows the jury knew there was more than one possible interpretation of the word "smack." *See generally,* Tr. Although the gang expert testified that "smack" meant "to kill" in Norteño slang, he also testified that "smack" can mean to hit or to beat up in common parlance. *See id.* at 1179:10-20 ("Q. I'm going to smack you upside the head, I'm going to smack you down? A. Yes. Q. Sometimes 'smack' means beat up? A. Yes. Q. 'Smack' can be used in an intimidating way. I'm going to smack you. A. Yes. Q. That would be intimidating. It can mean that? A. Sure."). The jury heard evidence that at another time petitioner used "smack" in a way that meant "to hit," while speaking to Barcenas. *Id.* at 1185:18-1186:21 (discussing an instance in which petitioner said he would "smack" Barcenas with a bag of noodles). Petitioner also took the stand and testified that he used "smack" in the letter to Barcenas to mean "rough him up, to hit him." *Id.* at 1259:22-27. The

jury was thus aware that, even when petitioner said "smack" to a Norteño, "smack" did not necessarily mean "kill."

Second, the jury was made aware that it needed to resolve the conflict in the interpretation of "smack," rather than blindly accepting the gang expert's assessment of its meaning. During jury instructions, the judge informed the jury that it "must decide what evidence, if any, to believe" in resolving conflicts, *id*. at 1714:21-22, and said that the jury was "not required to accept [expert opinion] as true or correct," *id*. at 1715:14-25. *See also* Clerk's Tr. at 447 (written jury instructions telling the jury it need not accept expert testimony as true). The jury instructions for the solicitation charge informed the jury that the prosecution had to prove intent on the solicitation charge, *see* Clerk's Tr. at 455 (quoting CALCRIM 441), and the jury was instructed that if "the People must prove something . . . they must prove it beyond a reasonable doubt," *see id*. at 434 (quoting CALCRIM 220). The prosecution also expressly told the jury during closing arguments that, as to the solicitation charge, the jury was responsible for deciding whether "smack" meant "to kill." *See* Tr. at 1751:22-25 ("And when he sent that letter and those calls and he sent out his friend Oliver Barcenas to smack Andy, did he mean to kill him. That's all you [the jury] have to do there."); 1752:15-19 ("Solicitation of murder. What do you people [the jury], using your common sense and looking at all the evidence, think those letter[s] meant when they say 'smack him before trial; I'll see it on the news. If he gets on the stand I'll never come home.'"). The jury was thus told, orally by the judge, in the written instructions, and by the prosecution, that it had to decide what "smacked" meant and that the meaning must be proved beyond a reasonable doubt.

Because petitioner's argument regarding the burden of proving intent is not properly before the Court, and because the record reveals that this burden was not improperly lessened or shifted, petitioner's claim fails. Petitioner is not entitled to federal habeas relief on this claim.

## IV. CONCLUSION

The petition for a writ of habeas corpus is DENIED.

Petitioner has not shown "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right [or] that jurists of reason would find it

24

debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529

U.S. 473, 484 (2000). Accordingly, a certificate of appealability is DENIED.

**IT IS SO ORDERED.**

DATED:  July 25, 2019

_____
LUCY H. KOH
UNITED STATES DISTRICT JUDGE

Case No. 18-CV-00911-LHK (PR)
ORDER DEN. PET. FOR WRIT OF HABEAS CORPUS; DEN. CERTIFICATE OF APPEALABILITY